IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JODI LYNN COONTZ HUCKS,

    Plaintiff,

v.                                                                          Civil Action No. 2:12-cv-76

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

**A. Background**

On November 14, 2012, Jodi Lynn Coontz Hucks, filed this action under 42 U.S.C. §§ 405(g) and 1383(c) for judicial for review of the decision of the Commissioner of Social Security that denied her claims for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 401-433, 1381-1383f. The Commissioner filed her Answer to this Complaint on February 1, 2013. Ms. Hucks and the Commissioner then filed cross motions for summary judgment, followed by Ms. Hucks's response to the Commissioner's motion. The motions are now ripe for this Court's review, and for this report and recommendation.

**B. Recommendation**

I recommend that:

1.     Ms. Hucks's Motion for Summary Judgment be **DENIED** because Ms. Hucks received a fair hearing where the ALJ developed a reasonably complete record. Moreover, there was substantial evidence to support the ALJ's decision to find

Ms. Hucks not fully credible, to afford little weight to the treating source, and in formulating the RFC.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

## II. FACTS

**A. Procedural History**

Ms. Hucks applied for benefits on December 14, 2009, alleging disability since April 30, 2005, due to problems with her neck, back, and knees. (R. 94-101, 123.) The application for benefits was denied in the first instance, and upon reconsideration. (R. 42-45.) Ms. Hucks then requested a hearing before an Administrative Law Judge (ALJ), which was held on September 9, 2011. Ms. Hucks waived her right to counsel and testified at the hearing, as did an impartial Vocational Expert (VE). On October 3, 2011, the ALJ issued an unfavorable decision finding that Ms. Hucks was not disabled. She appealed the decision to the Appeals Council, which denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. The instant action timely followed.

**B. Personal History**

Ms. Hucks was born on January 24, 1958. She completed high school in regular education classes, and has worked in the past as a pre-loader for United Parcel Services. She is married and has two grown step-children. Ms. Hucks lives with her elderly mother to assist her in day to day living.

**C. Medical History**

On January 13, 2009, Ms. Hucks completed a medical examination report for

commercial driver fitness determination, wherein she noted that, among other things, she did not have any spinal injury or disease, or low back pain. (R. 161.) Further, in conjunction with this report and based upon a physical examination, Karen Spotloe, PAC, found Ms. Huck's body system to be normal, noting, among others, that there were no abnormalities in the extremities and no previous surgeries. (R. 159.) Accordingly, Ms. Spotloe opined that Ms. Hucks met the qualifications for a two year commercial driver's license. (*Id.*)

On April 23, 2009, Richard E. Topping, M.D., described Ms. Hucks as a fifty-one year old "very active" female, who has problems with her right knee. (R. 153.) She reported no prior surgeries to this doctor, and stated that neither her left knee or hips give her any problems. (*Id.*) The doctor suspected a medial meniscus tear, and noted from radiographic views that there appeared to be a small osteophyte off the anterior and posterior aspect of her tibia. (*Id.*) After the doctor explained treatment options, Ms. Hucks told him that she was going to think about those options. (*Id.*)

Belington Community Medical Services (Belington) performed a general physical at the request of the West Virginia Department of Health and Human Services on December 11, 2009, which found right knee pain and left forearm pain. (R. 154-56.) This report found that Ms. Hucks could not work for a year. (R. 155.) A note from Ms. Hucks ophthalmologist dated December 27, 2009, noted that she was seen earlier that year and diagnosed with myopia and presbyopia. (R. 162.)

On March 24, 2010, Ms. Hucks reported to Arturo Sabio, M.D., for a consultative examination. Ms. Hucks reported continued neck and back pain from ruptured disks, for which she had surgical diskectomy and fusion in the cervical and lumber spine. (R. 167.) The doctor

noted scars consistent with this surgery. (*Id*.) Ms. Hucks also claimed that her right knee "popped" about two years prior to this consultation, and, although she never sought treatment for it, the knee still produced a lot of pain. (R. 165.) The doctor noted tenderness over the spinous processes of the lumbar spine and the right knee, and stiffness with the cervical spine and knee. (R. 167.) Further, the doctor noted normal straight leg rasing, and normal lumbar and hip flexion. (*Id*.) The doctor did note some restriction on the lateral rotation, extension, and flexion of the cervical spine due to pain and stiffness. (*Id*.) Finally, with regard to the right knee, the doctor found restriction in its flexion, and that Ms. Hucks was not able to walk on her heels or toes, stand on the right leg alone, or squat all the way. (*Id*.) His diagnostic impression was: (1) traumatic arthritis in the right knee; (2) status post diskectomy and fusion in the cervical and lumbar spine; and (3) degenerative disk disease. (*Id*.)

A physical residual functional capacity assessment (RFC) was performed on April 7, 2010, which listed a primary diagnosis of traumatic arthritis in the right knee and degenerative disk disease in the lumber spine, and found Ms. Huck's alleged complaints only partially credible. (R. 169, 176.) The assessment found that Ms. Hucks could occasionally lift twenty pounds and frequently lift ten pounds, and that she could sit, stand, or walk, for about six hours of an eight hour day. (R. 170.) Further, the assessment found that Ms. Hucks could only occasionally climb ramps or stairs, kneel, crouch, or crawl, and that she should never climb ladders, ropes, or scaffolds. (R. 171.) The assessment found no manipulative, visual, or communicative limitations. (R. 172-73.) Finally, the assessment found that Ms. Hucks should avoid concentrated exposure to extreme cold and heat, and should avoid concentrated exposure to hazards. This RFC was affirmed as written by Fulvio Franyutti, M.D., who

specifically discredited the finding by Belmont that Ms. Hucks could not work because it was not supported by the evidence. (R. 191.)

On April 29, 2010, disability services conducted a mental assessment that stated Ms. Hucks received low grades in school and was not able to comprehend what was said to her; rather she needed to see instructions on paper. (R. 142.) Moreover, the report noted that Ms. Hucks has problems concentrating, which affects her ability to work, and she also feels like people are always staring at her because of her disabilities. (*Id.*) On May 7, 2010, a psychiatric review technique was performed, which found no medically determinable impairment. (R. 177.) The report notes that no mental impairment is alleged, but that Ms. Hucks has difficulty with math, and that her concentration is affected due to pain. (R. 189.) Moreover, it notes her trouble with spoken directions. (*Id.*)

On February 11, 2011, Belington performed another general physical at the request of the West Virginia Department of Health and Human Services, which again found that Ms. Hucks could not work for a year. This report was practically a recitation of the previous one.

**D. Testimonial Evidence**

At the outset, the ALJ thoroughly discussed Ms. Hucks's right to be represented by an attorney at the hearing, the avenues to obtain an attorney, and what an attorney might be able to help her with. (R. 24-25.) Ms. Hucks stated that she fully understood, and that she wished to proceed with the hearing unrepresented. (R. 25.) The ALJ then went through the exhibits with Ms. Hucks and admitted them into evidence. (R. 26.) Further, the ALJ asked if the record was complete, or if Ms. Hucks wished to add any more medical evidence to it. (*Id.*) Ms. Hucks noted that there were some records from her back surgery, which was ten years prior to the

hearing, but that those records were no longer available. (*Id*.) The ALJ then proceeded with the testimony.

Ms. Hucks testified about her marriage, and that she lives with her elderly mother to assist her in day to day life. (R. 27.) The ALJ then queried what Ms. Hucks does for her mother, to which she replied that she is her primary care giver. (*Id*.) She further testified that she drives about three times a month, when she takes her mother to the doctor, and that they usually do the shopping during these trips. (R. 27-28.) Ms. Hucks testified that she graduated high school in regular education classes, and that she can read and write, but she has to do arithmetic on paper. (R. 29.)

The ALJ asked Ms. Hucks why she is unable to work. She replied that she is her mother's primary caretaker, and that she cannot have a job where she stands. (R. 30-31.) When asked about the significance of her date of disability, Ms. Hucks responded that was the date of her neck surgery. (R. 31.) The ALJ asked about that surgery, and Ms. Hucks told him that she had a plate put in her neck because several disks were removed, but she never had any physical therapy after the surgery. (R. 32.) She stated that she has not attempted to find work since the surgery. (R. 33.)

The ALJ then went over Ms. Huck's medical conditions, and how they affect her ability to work. Ms. Hucks started with her back, stating that she cannot stand for very long or bend over. (R. 33.) Further, she stated that she has a throbbing pain in her neck between the shoulder blades. (*Id*.) She takes tylenol for the pain. (*Id*.) Ms. Hucks also testified that her knees and hips hurt. Finally, she testified that she does not like being out in public. (R. 34.) The ALJ then asked about Ms. Huck's activities of daily living. She testified that she is able to shower

6

and dress herself, and basically does all of the housework except for mowing the lawn or shoveling snow. (R. 34-35.) Further, a typical day involves watching television. (R. 35.)

The ALJ then examined the VE. First, the VE defined the regional economy, and stated that Ms. Huck's past work would be characterized as heavy, semi-skilled work. The ALJ then posed the following hypothetical to the ALJ:

> assume a hypothetical individual of the same age, education and work experience as the claimant who retains the capacity to perform light work with a sit stand option allowing the person to briefly for one to two minutes alternate sitting or standing positions at thirty minute intervals throughout the day without going off task. Who's limited to no foot control operation bilaterally. Who's limited to occasional posturals except no climbing of ladders, ropes or scaffolds. Must avoid concentrated exposure to extreme cold and heat. Who must avoid all exposure to unprotected heights, hazardous machinery and commercial driving.

(R. 38.) The VE responded that this hypothetical person could not perform Ms. Huck's past employment, but that several occupations in the light exertional level could accommodate these restrictions. (*Id.*) The VE then detailed these positions and the number of positions available in the regional and national economy. (R. 38-39.) Finally, the VE testified to employer tolerances for late and off task employees. (R. 39-40.)

### III.  THE MOTIONS FOR SUMMARY JUDGMENT

**A. Contentions of the Parties**

Ms. Hucks raises several points of error that she believes shows the decision was not based upon substantial evidence: (1) the ALJ treated the hearing, at which Ms. Hucks appeared unrepresented, as adversarial, and failed to fully develop the record; (2) the ALJ discredited a treating physician's records; and (3) the ALJ arbitrarily relied on an RFC that was created by

7

a non-physician and affirmed by a doctor who did not denote what records he reviewed. The Commissioner, on the other hand, contends that the Ms. Hucks received a fair hearing, the record was fully developed, and the ALJ's decision was based on substantial evidence.

**B. The Standards**

   *1. Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

   *2. Judicial Review*

Only a final determination of the Commissioner may receive judicial review. *See* 42 U.S.C. §405(g), (h); *Adams v. Heckler*, 799 F.2d 131,133 (4th Cir. 1986). Moreover, An ALJ's findings will be upheld if supported by substantial evidence. *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998). Substantial evidence is "not a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), but that which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971). Further, the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

   *3. Social Security - Medically Determinable Impairment - Burden.*

Ms. Hucks bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

**C. DISCUSSION**

As noted, Ms. Hucks raises several contentions of error by the ALJ, and the Court will address each one in turn, but the Court will first address an argument that crosses several sections of her memorandum about the ALJ's reference to the subjective complaints of Ms. Hucks. The crux of this argument is that the government uses the Federal Rules of Evidence, and that an exception to the hearsay rule under Federal Rule of Evidence 803 provides that the subjective complaints by a patient made for the purpose of treatment have a guarantee of trustworthiness. Thus, the ALJ is in error to discount these statements. The Court finds this argument unavailing.

The Federal Rules of Evidence do not apply to administrative hearings. *Hardesty v. Astrue*, 592 F.3d 1072, 1080 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 2443 (2011). Further, it is clearly within the province of the ALJ to weigh the credibility of a claimant, and courts typically should not interfere with these determinations. *Hatcher v. Sec'y of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989); *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984) (finding

9

that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

After reviewing the record, the Court finds that there is no reason to disturb this credibility determination. The ALJ found that the severity of the pain alleged simply was not supported by the medical history or Ms. Hucks testimony about the activities she can perform. First, the ALJ concluded that Ms. Hucks certainly suffered from some physical ailments, but that a person with the severity of pain alleged by Ms. Hucks would seek out care for that pain. *See e.g. Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("Pain is not disabling *per se*, and subjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof.") Further her activities of daily life, including being her mother's primary caregiver, were not consistent with the disability alleged. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (finding that the ALJ will consider a claimant's daily activities in making a credibility determination).The ALJ also noted that Ms. Hucks reported to her doctor, in association with her request for a renewal of a commercial driver's license, that she did not have any pain in her extremities or prior surgeries less than a year before submitting her application for benefits. Finally, the ALJ found that the state agency doctor's examination showed only mild limitations in the range of movement of the extremities where the pain was alleged. This is substantial evidence for the ALJ's credibility determination.

### *1. The Actions of the ALJ*

Ms. Huck's argument here is divided into two parts: first that the ALJ did not treat her fairly considering she was not represented by a lawyer at the hearing, and second that he

failed to develop the record with regard to her neck surgeries, mental health, and inconsistencies in the record. The Court will address each in turn.

*a. ALJ's Treatment of Ms. Hucks*

Ms. Huck's main argument here is that, as a *pro se* claimant, the ALJ treated her unfairly by using leading questions to elicit unfavorable testimony, and failing to elicit supporting testimony. For example, Ms. Hucks claims that the ALJ led her into admitting that she is her mother's primary caretaker and that she does all of the housework, but did not request further testimony after Ms. Hucks testified that she does not like to be out in public. Thus, she contends that she received a prejudicial hearing and her due process rights were violated.

It is well-established in the Fourth Circuit that a claimant, appearing *pro se*, is "entitled to the sympathetic assistance of the ALJ to develop the record, to assume a more active role, and to adhere to a heightened duty of care and responsibility." *Crider v. Harris*, 624 F.2d 15, 16 (4th Cir. 1980) (internal quotation marks and citation omitted). When presented with a *pro se* claimant, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir.1980); *see also Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) (finding that because "Social Security proceedings are inquisitorial rather than adversarial," the ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits").

After reviewing the transcript of the hearing, the Court finds that the ALJ conducted a non-adversarial hearing that was in all aspects conventional for a Social Security hearing. The ALJ asked Ms. Hucks about her personal life, her work history, her activities of daily living, and

her physical ailments. For example of the typicality of the lines of questioning, the ALJ asked Ms. Hucks about her marital status, to which she replied she was married and had two step-children. The ALJ then asked who lived in her household besides herself. Ms. Hucks replied that she lives with her mother. The ALJ followed up by asking if she was separated from her husband, and Ms. Hucks offered that she was not; she was living with her mother to take care of her. As another follow-up question, the ALJ asked what she does to take care of her mother, and Ms. Hucks responded that she is her primary care giver. Later in the hearing, the ALJ asked Ms. Hucks why she is unable to work, and Ms. Hucks again told him that she is her mother's primary caretaker, and also that she cannot have a job where she stands.

It does not appear to the Court that any of Ms. Huck's responses to the ALJ's questions were so ambiguous as to require follow up questions where follow up questions were not asked. Further, all of the questions were non-confrontational, and it is not evident from the record that there was any prejudice, bias, or harassment on the part of the ALJ that would deny Ms. Hucks due process in the hearing. *See e.g. Good v. Astrue*, 2008 WL 622746, *4 (W.D. Va. Mar. 7, 2008) (finding that it must be evident from the record that due process was not afforded, and not based on speculation or inference); *Navistar Int'l Trans. Corp. v. United States E.P.A.*, 941 F.2d 1339, 1360 (6th Cir.1991) (prejudice by a decision maker must be evident from the record and may not be based on speculation or inference); *Id.* at 1360 (finding that a decision maker is presumed to be unbiased, and this presumption can be overcome only with convincing evidence that "a risk of actual bias or prejudgment" is present).

*b. Developing the Record*

Ms. Hucks's argument with regard to the development of the record is threefold. First, she claims that the ALJ should have sought out records of her past surgeries; second, that the ALJ should have ordered a mental health consultative examination based upon the evidence presented; and third, that the ALJ should have re-contacted Belington to address inconsistencies. Although the ALJ has a duty to "explore all relevant facts and inquire into the issues necessary for adequate development of the record, *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir.1986), "he is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Bell v. Chater*, 57 F.3d 1065 (4th Cir.1995) (quoting *Clark v. Shalala*, 28 F.3d 828, 830–831 (8th Cir.1994)). In evaluating whether the ALJ has fulfilled that duty, the Court must determine "whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'" *Smith v. Schweiker*, 677 F.2d 826, 830 (11th Cir.1982) (quoting *Ware v. Schweiker*, 651 F.2d 408, 413 (5th Cir.1981)). Reversal of the ALJ regarding record development is only warranted where the ALJ's failure to develop the record results in prejudice—namely, that the ALJ "could and would have adduced evidence that might have altered the result." *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir.1984).

With regard to records of her surgeries, Ms. Hucks stated at the outset of the hearing that the records from her back surgery in the early 1990s had been destroyed by that office. Thus, the ALJ could not have obtained those records if he tried. There was also the issue raised with regard to records of Ms. Huck's neck surgery in 2005. Ms. Hucks did not submit those records and the ALJ did not seek them out. Although the ALJ not inquiring further into whether Ms. Hucks could provide them, or seeking them out himself, is questionable, Ms. Hucks can show no prejudice from this shortcoming. In his written opinion, the ALJ accepted the

13

"reported history and the references to [the surgeries] throughout the claimant's medical records as true and accurate reflection of her alleged conditions." Accordingly, the ALJ found that Ms. Hucks suffered from severe impairments associated with these surgeries and incorporated them into limitations in the RFC.

Ms. Hucks also claims that the ALJ should have ordered a consultative examination with a mental health expert based on the record, and her statements that she does not like to go in public because she feels that people make fun of her for her scars. It is discretionary for an ALJ to order a consultative examination. *See* 20 C.F.R § 404.1519a(b) ("We *may* purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim.") (emphasis added); *see also Bishop v. Barnhart*, 78 F. App'x 265, 268 (4th Cir. 2003). Moreover, this Court should defer to that discretionary function so long as the record contains sufficient evidence for the ALJ to make the decision not to order the examination. *See e.g. Keplinger v. Astrue*, 2008 WL 4790663, at *5 (W.D. Va. Nov. 3, 2008) (citing *Wren v. Sullivan*, 925 F.2d 123 (5th Cir. 1991)).

Here, the record contains sufficient evidence to support that decision. Ms. Hucks did not allege any mental health problems on her application for disability, and has not been treated for any mental health problems in the past. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a) ("We will consider only impairment(s) you say you have or about which we receive evidence.") There was a mental health assessment done in connection with the application for benefits that noted that Ms. Hucks needed written rather than spoken instruction, that she has problems concentrating, and that she has problems getting along with other people. Dr. Allen,

a state agency consultant, considered this mental health assessment in his psychiatric review technique and found no medically determinable mental impairments. This determination is the only one in the record, and, as the only mental health determination in the record, it is clearly enough to support the ALJ's discretionary decision to not order a consultative examination.

Finally, Ms. Hucks contends that the ALJ should have contacted Belington about inconsistencies in the evidence, which signed off on her physical to drive a commercial vehicle in January 2009 but found her unable to work in December 2009 and February 2011. "An ALJ is required to re-contact medical sources only when the record before the ALJ provides inadequate evidence to determine whether the claimant is disabled." *Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 834 (N.D.W.V. 2009). Here, the evidence from Belington opined on two occasions that Ms. Hucks could not work for a year based on a physical. The ALJ discounted that evidence, as will be discussed in more detail *supra*, but the Court cannot say that the evidence was inadequate to the extent that the ALJ would be required to re-contact the source. Rather, it appeared clear that the source was of the opinion that Ms. Hucks could not work.

## *2. Discrediting the Treating Source*[1]

Ms. Hucks argues that the ALJ improperly discredited an opinion by Belington that she could not work by instead attacking the credibility of that institution. Whether a claimant

---

1In her response to the Commissioner's motion for summary judgment, Ms. Hucks contends that the records from Belington, which opine that Ms. Hucks cannot work, are actually a determination by DHHR that she cannot work; a departure from her position in her motion for summary judgment where she adopts these reports as those of Belington. It appears to the Court that these papers are a standard referral sheet to be filled out by a treating physician because it directs the doctor filling out the paper to send it back to DHHR–the ALJ notes the same in his opinion. Moreover, the first and last page of Exhibit 8F, one of the exhibits that Ms. Hucks claims is a DHHR determination, is printed on Belington letterhead and signed the same day as the physical was completed. Thus, although the form itself might be from DHHR, the doctor that filled it out is not a DHHR doctor.

meets the standards for disability is a legal issue reserved solely to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Thus, an opinion, even by a treating physician, regarding an claimant's ability to work is not entitled to any particular weight or deference. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). However, controlling weight may be given to treating source medical opinions, *i.e.*, opinions on the issue of the nature and severity of an individual's impairment, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2); *see also Craig*, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 20 C.F.R. §§ 404.1508; *Throckmorton v. U.S. Dep't of Health and Human Servs.*, 932 F.2d 295, 297 n.1 (4th Cir. 1990). Again, subjective evidence of pain alone "cannot take precedence over objective medical evidence or the lack thereof." *Gross*, 785 F.2d at 1163.

The ALJ afforded very little weight to the findings of Belington that Ms. Hucks cannot work because the records were "fraught with highly questionable conclusions based primarily on the claimant's subjective complaints and no medically subjective standards." Further, he found "no basis in fact or in any clinical/laboratory finding to justify the conclusion . . . that claimant is simply unable to work." This is exactly what the regulations require the ALJ to do:

16

look at the opinion of the treating source and determine if that opinion is backed by medically accepted clinical or laboratory diagnostic techniques. The ALJ determined that the findings were not; rather, they were based solely on Ms. Hucks subjective complaints. Accordingly, he afforded them little weight.

Furthermore, the ALJ found the findings to be inconsistent with the other record evidence, which he afforded greater weight. Specifically, he afforded the most weight to the state agency doctor who performed, and reported the results of, several clinical tests. Further, the ALJ afforded some weight to the orthopedic specialist that saw Ms. Hucks on a single visit. Clearly then, there is substantial evidence to support the ALJ's conclusion to not afford the treating source evidence and opinion controlling weight.

### *3. The RFC*

Ms. Hucks final contention of error is that the RFC was created by a non-medical layperson, Jim King, and affirmed by a doctor that did not indicate what records were reviewed.[2] Further, that the RFC contradicted all other record evidence. Accordingly, she contends, the ALJ's decision that Ms. Hucks can perform light work is not based upon substantial evidence. "[R]esidual functional capacity is the most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). "It is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record." *Felton-Miller v. Astrue*, 459 Fed. App'x 226, 230-31 (4th Cir. 2011)*; see also* 20 C.F.R. §§ 404.1546(c), 416.946(c) (assigning responsibility of RFC assessment at hearing level to ALJ);

---

[2] Dr. Franyutti denoted that he reviewed *all* records, and specifically reviewed the Belington records because he, too, found them not supported by any evidence.

SSR 96–8p (identifying RFC finding as administrative assessment and outlining criteria to be used). Further, an ALJ is "not required to obtain an expert medical opinion as to [a claimant's] RFC," and can properly base the RFC on a claimant's " subjective complaints, the objective medical evidence, and the opinions of treating, examining, and nonexamining physicians." *Felton-Miller*, 459 Fed. App'x at 231.

The Court finds that the ALJ reviewed the entire record, both medical and non-medical evidence, as he is required to do. *See* 20 C.F.R. § 404.1520(e). The ALJ considered the state agency medical consultant's opinion, Ms. Huck's testimony, and the medical evidence. In sum, the ALJ's extensive discussion of the evidence he reviewed and considered provides substantial evidence to support his RFC determination that Ms. Hucks was capable of light work with certain additional limitations.

In a footnote in her motion for summary judgment, Ms. Hucks also argues that because the RFC was not based upon substantial evidence, then the hypothetical given to the VE was flawed. An ALJ is afforded "great latitude in posing hypothetical questions," *Koonce v. Apfel*, No. 98–1144, 1999 WL 7864, *5 (4th Cir. 1999), and need only pose those that are based on substantial evidence and accurately reflect a claimant's limitations. *See e.g. Copeland v. Bowen*, 861 F.2d 536, 540–41 (9th Cir. 1988). As noted, the ALJ's RFC was based upon substantial evidence. It then follows that the hypothetical posed to the VE was based upon substantial evidence.

## IV. RECOMMENDATION

The Court finds that the ALJ performed the heightened duty required when a claimant appears unrepresented, and fully developed the case as he was required. Moreover, there was

18

substantial evidence to support the ALJ's credibility determination, his according little weight to the records of Belington, and his formulation of the RFC. Accordingly the undersigned **RECOMMENDS THAT**:

1. Ms. Hucks's Motion for Summary Judgment be **DENIED**.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: April 3, 2013
/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE